**UNITED STATES of America, Plaintiff,**

v.

**Eugenia Amparo OSORIO de SANTIA-GO, Ariel Santiago, Rosa Santiago, Manuel Flores, Defendants.**

**Crim. No. 85–489 (JAF).**

United States District Court,
D. Puerto Rico.

Jan. 17, 1986.

Franklin Mandel, New York City, Francisco Dolz Sanchez, Old San Juan, Puerto Rico, for Eugenia Amparo Osorio de Santiago.

Jorge Toledo, Hato Rey, Puerto Rico, Arturo Negrón Garcia, Santurce, Puerto Rico, for Rosa Santiago.

Frank Inserni, Hato Rey, Puerto Rico, for Ariel Santiago.

William De la Cruz, San Juan, Puerto Rico, for Manuel Flores.

## MEMORANDUM OPINION IN SUPPORT OF ORDER

FUSTE, District Judge.

Defendants were indicted on charges of aiding and abetting to achieve an unlawful importation of cocaine in violation of 21 U.S.C. § 952(a), 18 U.S.C. § 2. Defendants were also charged with unlawful possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2.

On December 26 and 27, 1985, co-defendant Osorio de Santiago filed a motion for return of property and a motion to suppress evidence. Fed.R.Crim.P. 41(e)(f). This Memorandum Opinion is entered in support of our Order given in open Court on January 7, 1986. On said occasion we heard evidence and denied defendants' motions to suppress.[1]

### I.

The following account is based on our credibility judgment of government witnesses that testified at the combined preliminary and detention hearing held on November 14, 1985, and at the suppression hearing held on January 7, 1986.

On November 9, 1985, at approximately 1:00 P.M., U.S. Customs Service officers at Pier 3, San Juan, Puerto Rico, observed that Manuel Flores, a crewmember of the M/V CARLA C, disembarked walking in a strange manner. He seemed to have difficulty in flexing his shoes as he walked. The agents became suspicious. A lawful border search on Flores produced 527.9 grams of cocaine. The controlled narcotic was concealed in compartments under the inner sole of Flores' shoes. The crewmember was placed under arrest and was *Miranda* warned. A search incidental to the arrest produced a piece of paper with a

---

1. The motion for the return of property relative to $8,368.61 is in the nature of a motion to suppress. The trial of this cause took place January 8–10, 1986. Co-defendant Flores pleaded guilty. The remaining co-defendants were found guilty on both counts of the indictment. We note that the evidence received at trial reinforces and does not detract from the factual scenario developed during the hearing on the motions to suppress held January 7, 1986.

note indicating "Dupont Plaza Hotel, Room 902".

During the post-arrest detention, Flores voluntarily stated that he had an agreement to deliver the cocaine to the occupants of Room 902 in exchange for $500.00. Flores was not aware of the identity of the recipients of the cocaine. At about 1:45 P.M., Flores voluntarily agreed to cooperate with government authorities by performing a controlled delivery of the cocaine. A surveillance team of about ten Drug Enforcement Administration and U.S. Customs Service agents was established. The team arrived at the Dupont Plaza Hotel at about 2:15 P.M. At least one of the agents there posted had observed a male, later identified as Ariel Santiago, and two females, later identified as Eugenia Osorio de Santiago and Rosa Santiago, check out of the hotel. Properly speaking, DEA agent Enrique Nieves saw Ariel Santiago check out and board a taxi where two females were waiting. As they left the hotel in the taxicab, the three individuals were followed in another vehicle by DEA agents F. Duncan and E. Nieves up to the Palace Hotel in Isla Verde. After the individuals arrived at the Palace Hotel, the agents saw the male (Ariel Santiago) and one of the females (Rosa Santiago) board another cab. The couple came to Pier 6 in Old San Juan. Eugenia Osorio de Santiago was not seen boarding the second cab. On foot, the two mentioned persons approached Pier 3, where the M/V CARLA C was stationed. There, they met cooperating co-defendant Flores and Customs agent Ken Torres, who was acting in undercover capacity as a narcotics trafficker.

Meanwhile, at the DuPont Plaza Hotel, the agents learned that Room 902 had been registered to E. Santiago with address at 232 Stanhope St., Brooklyn, New York.

The hotel manager agreed to open Room 902. The group proceeded upstairs, knocked on the door, but no one answered. The manager opened the door and realized that the occupants were gone.

Agent Ken Torres testified at the suppression hearing that at Pier 3 he pointed to either his shoes or to Flores' shoes. Co-defendant Ariel Santiago nodded as if he understood. Ariel and Rosa Santiago then invited the agents to Room 2025 of the Palace Hotel. This invitation given by signals and brief words was subsequently confirmed by Ariel Santiago in a cafeteria nearby the Palace hotel. It appears that the agents later discovered that the name and address listed for the registered guest of Palace 2025 was the same as the one provided for Dupont 902.

At about 4:15 P.M., agent Ken Torres, in an undercover capacity and with cooperating co-defendant Flores, arrived at the Palace Hotel. They met briefly behind a rental car business. Flores put his cocaine-loaded shoes back on. Both persons joined Ariel Santiago, who had arrived independently at the hotel area, and the three took the elevator to the twentieth floor. Rosa Santiago was not in the elevator with them. As they stepped out into the hallway, Ariel Santiago commented in Spanish that "they had caught two this morning", as if implying a motive for their sudden change of accommodations. Ariel Santiago then knocked on the door of Room 2025, although it is unclear as to who opened the same, that is, Ariel Santiago or an occupant. Santiago then escorted agent Torres and co-defendant Flores into the room, where they met Eugenia Osorio de Santiago and Rosa Santiago. Agent Torres saw as Manuel Flores gave the shoes with the cocaine—that had earlier been seized—to Ariel Santiago. Torres then observed as Ariel passed on the shoes with the cocaine to Eugenia Osorio de Santiago, Ariel Santiago's wife. Rosa Santiago inquired whether Manuel Flores had an extra pair of shoes. He did not. One or the other female asked Ariel Santiago to buy two pairs of shoes for Flores and Torres. Torres had indicated that he also had cocaine in his sneakers. The cocaine delivery lasted about five minutes.

Agent Ken Torres further testified that he had previously arranged with his fellow officers that upon his opening the door of Room 2025, that would constitute the sig-

nal for an immediate apprehension of the occupants.

The three or four agents who were to assist Torres stood by the side of the hallway in a place not visible to one opening the door of Room 2025. As Torres opened the door, presumably to buy a pair of shoes with Ariel Santiago and also to signal his colleagues, he could not see or hear his fellow officers. In a split second decision, agent Torres initiated the arrest procedure by himself, starting with Ariel Santiago by grabbing him at the moment he was about to leave the room. Torres identified himself as a federal agent. Immediately thereafter, the other agents entered the hotel room without a warrant and assisted Torres in arresting the defendants. Agent Torres took custody of Flores. The *Miranda* warnings were dutifully given. The arrest did not give rise to any physical violence nor to any overt destruction of evidence. At the time of the arrests, the agents noticed several handbags scattered throughout the room. Some were on top of a dresser, others on a bed. The handbags were seized by government agents, and later searched at the U.S. Customs House in Old San Juan. Defendants seek to suppress the fruits of said search, including $8,368.61 and some airline tickets seized from one of the handbags. The airline tickets are not material. They were not used as evidence at trial.

## II.

At the outset we must decide whether the warrantless entry by undercover agent Ken Torres into room 2025 of the Palace Hotel constitutes a "search" within the meaning of the Fourth Amendment.[2] Absent a "search", the Fourth Amendment standards governing the reasonableness of the government's intrusion are inapplicable.

A "search" represents an infringement by the government of a legitimate expectation of privacy, one which society is prepared to accept as reasonable. *Katz v. United States*, 389 U.S. 347, 351–53, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967). If a person has control over information which he considers to be personal, but he fails to make an objective manifestation of it, no legitimate expectation of privacy can possibly attach. Even when the accused has a subjective expectation that an illegal activity would go unnoticed by the authorities, there is no privacy in the *Katz* sense for activities conducted in "open fields". *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). Similarly, there is no "search" when an undercover agent enters a store as an ordinary customer for the purpose of transacting business. *Maryland v. Macon*, —— U.S. ——, ——, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. at 511. Thus, a home or hotel room is not any different from a store or any public place when objectively it appears that an expectation of privacy which *could* have been recognized as legitimate, was lost. *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). In *Lewis*, the Supreme Court recognized the value of undercover police activity for effective law enforcement. There, as here, an undercover agent was *invited* and admitted by defendant into his home for the purpose of negotiating a felonious sale of narcotics. The Supreme Court of the United States held:

---

**2.** Flores, the only defendant with standing to challenge the seizure of the cocaine, has not contested the legality of the border search and seizure. As to the government entry into Room 2025 of the Palace Hotel, the "standing" of co-defendants is premature, unless we first find that said intrusions constitute a "search". Both are distinct inquiries. *See* Y. Kamisar, W. La-

Fave, J. Israel, *Modern Criminal Procedure*, Ch. 11 at 806 (5th ed. 1980). A "search" focuses on the nature of the particular government intrusion and its impact on anyone's legitimate privacy interests, whereas "standing" refers to the particular person that has a right to assert that his legitimate privacy concerns have been infringed by government conduct.

Without question, the home is accorded the full range of Fourth Amendment protections. (citations omitted). But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.

*Id.* at 211, 87 S.Ct. at 427.

■ Here, agent Ken Torres, while at Pier 3, was invited by Ariel and Rosa Santiago, and later escorted by Ariel Santiago, into Room 2025 of the Palace Hotel only for the purpose of executing a felonious sale of cocaine. Further, there has been no deception of the kind proscribed by *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The consensual entry by agent Torres is therefore not a Fourth Amendment "search". This holding is not intended to undercut the well-established rule that an occupant of a hotel room is entitled to have as much privacy there as in his own home, absent the criminal activity described herein. *United States v. Jeffers*, 342 U.S. 48, 51–52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951); *United States v. Baldacchino*, 762 F.2d 170, 175–76 (1st Cir.1985); 1 W. LaFave, *Search and Seizure*, Ch. 2 § 2.3(b) at 298 (1978). We emphasize, however, that whatever privacy interests could have been asserted by the occupants of Room 2025, those interests vanished as a result of the legitimate undercover police activity conducted in this case. The lawful entry and presence of agent Torres also "... precludes any argument that later entries [by his fellow officers] violate the privacy of occupants." *United States v. Bradley*, 455 F.2d 1181, 1186 (1st Cir.1972), *aff'd on other grounds*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973); *cf. United States v. Harris*, 713 F.2d 623, 626 (11th Cir.1983) ("search", but exigent circumstances justified re-entry);

*United States v. Farra*, 725 F.2d 197, 199 (2d Cir.1984) (warrantless entry justified by exigent circumstances).

■ When an undercover agent conducts a criminal investigation within the boundaries of *Lewis v. United States*, 385 U.S. at 211, 87 S.Ct. at 427, as agent Torres did here, any subsequent intervention by his fellow law enforcement officers with the purpose of *assisting* said agent in the apprehension of suspects is *not* a Fourth Amendment "search". Accordingly, it is unnecessary for us to consider whether any exigent circumstances could have justified a warrantless "search" of the premises. *But cf., United States v. Veillette*, 778 F.2d 899, 902 (1st Cir.1985).

### III.

We turn now to the legality of the warrantless arrests of co-defendants Ariel Santiago, Rosa Santiago, and Eugenia Osorio de Santiago.

■ Based on the totality of the circumstances of this case, the agents had reason to believe that a crime was being committed, or about to be committed by defendants. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). While at Palace Hotel Room 2025, agent Torres witnessed Manuel Flores give the cocaine-loaded shoes to Ariel Santiago. He also observed how Ariel passed the shoes to Eugenia Osorio de Santiago. Accordingly, agent Torres had probable cause to initiate the arrest, commencing with Ariel Santiago. As to the assisting officers, probable cause was also present. First, both the surveillance team and the plans for the controlled delivery were initiated as a result of co-defendant Flores' willingness to deliver the cocaine to the occupants of Room 902. Second, as is typical of many drug transactions, the agents gained knowledge of defendants' sudden change of accommodations and were aware of the meeting of Ariel and Rosa Santiago with undercover agent Torres and co-defendant Flores at Pier 3, and of the subsequent invitation to the Palace Hotel. The agents

had reason to believe that the occupants of Room 2025 were probably the same as those previously occupying Room 902. Finally, the agents saw—pursuant to their pre-arranged plan—as agent Torres opened the door of Room 2025 and initiated the arrest of Ariel Santiago. We conclude that probable cause existed. That *alone* legally justifies the warrantless arrests of Ariel Santiago, Eugenia Osorio de Santiago, and Rosa Santiago.

Our analysis is not in contradiction with the settled rule that absent exigent circumstances, warrantless arrests inside the home are unlawful even when supported by probable cause. *Payton v. New York*, 445 U.S. 573, 585–89, 100 S.Ct. 1371, 1379–81, 63 L.Ed.2d 639 (1980). *Payton* clearly presupposes an unwarranted, non-consensual intrusion into the privacy of an individual's home that is noticeably absent here. *Id.* at 583, 100 S.Ct. at 1378. That case "... did not purport to decide ... whether an initial consensual entry would justify a subsequent warrantless arrest." *United States v. White*, 660 F.2d 1178, 1182–83 (7th Cir. 1981). Having already determined the legality of the initial entries under *Lewis*, and the requisite probable cause, we hold that *United States v. Watson*, 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 979 (1976), which justifies a warrantless, probable cause arrest in a public place, controls here. *In accord, Florida v. Perry*, 398 So.2d 959, 961 (Fla.Dist.Ct.App. 1981). The arrests of defendants are, as stated before, lawful.

## IV.

Concurrent with the lawful arrests, the agents seized several handbags which were visibly scattered throughout the room. A stationhouse search of the handbags later

produced evidence to be used by the government at trial, to wit: the $8,368.61. The government contends that the seizure was constitutional as the evidentiary items were in "plain view", and that the stationhouse search constituted a valid inventory search. Defendants do not appear to question the legality of the seizure. They do contend that the inventory search cannot be justified under *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).[3]

It is undeniable that the government's taking of the property located inside of the room constitutes a Fourth Amendment "seizure", as it interfered with defendants' possessory or ownership interests. *See Project: Criminal Procedure*, 73 Geo.L.J. 253, 312–17 (1984). The Supreme Court, in *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3323, 77 L.Ed.2d 1003 (1983), explained:

> The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity.

■ As to the first requirement, we have concluded that the officers were lawfully present inside the room at the time of the seizure. With respect to probable cause, the standard is *not* whether the officers *knew* that incriminating evidence would be found inside the handbags, but whether there was a fair probability that the contents of the luggage may be "useful as evidence of a crime." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). Given all the circumstances surrounding the arrests of said de-

**3.** At the trial, this matter came to light in a complete perspective. A customs agent, while arresting the female co-defendants at Palace Hotel Room 2025, noticed Eugenia Osorio de Santiago's foreign accent. As a matter of fact, the file of this cause shows that she is a Colombian national with residence in the United States. The customs agent asked the co-defendant for an identification card. She stated that her ID card was in a handbag and allowed the agent to secure the same. When the agent opened the handbag, he saw a substantial amount of money. The identification of the arrested co-defendant was done. The agent instructed others to transfer the co-defendant to the U.S. Customs House with her bag so that the exact amount of money could be accounted for. These facts do not alter our finding on the subject of the inventory search.

fendants, the agents had reason to act as they did regarding the seizure of the luggage at the scene of the delivery of narcotics. Thus, we agree that the items seized were in "plain view".[4] This brings us to Osorio's motion for return of property, i.e., monies seized from her handbag at the U.S. Customs House in Old San Juan. Fed.R. Crim.P. 41(e).

■■■ A post-arrest inventory search of an arrestee's person or area within his immediate control or possession is lawful even without probable cause. *Illinois v. Lafayette,* 462 U.S. at 643–44, 646, 103 S.Ct. at 2608, 2609. Beyond the narrow confines of *Lafayette,* a valid inventory search may still be justified if the government proves that 1) the intrusion into the home did not raise Fourth Amendment concerns, and 2) there was probable cause to seize items *beyond* the arrestee's person or area within his immediate possession or control. Here, the agents were lawfully inside the room, and also had probable cause to seize those evidentiary items in plain view. *Cf. United States v. Lyons,* 706 F.2d 321, 331–35 (D.C.Cir.1983). The rationale which justified an inventory search in *Lafayette,*[5] fully applies where, as here, the government entries are consensual, and the subsequent arrests and seizures are lawful. We conclude that in this case the government's search of Osorio's handbag at the stationhouse was reasonable.

By virtue of the foregoing, our bench ruling of January 7, 1986 at the conclusion of the suppression hearing stands. The

motion for the return of moneys and the motion to suppress shall stand DENIED.

IT IS SO ORDERED.

---

4. At the suppression hearing, the government did not establish the location of the items seized with respect to the location of those defendants arrested. This made it impossible for us to decide at the suppression hearing whether *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), applied. Notwithstanding that fact, at trial the evidence established clearly the relationship of the moneys seized with a particular defendant, Eugenia Osorio de Santiago. *See* footnote 3, *ante.*

5. "This inventory, which is a search for Fourth Amendment purposes, has been rather consist-

ently upheld by the courts as meeting these legitimate objectives: (1) protecting the arrestee's property while he is in jail; (2) protecting the police from groundless claims that they have not adequately safeguarded the defendant's property; (3) safeguarding the detention facility by preventing introduction therein of weapons or contraband; and (4) ascertaining or verifying the identity of the person arrested." W. LaFave & J. Israel, *Criminal Procedure,* Ch. 3 § 3.5(c) at 251 (1984). Items 1 and 4 are directly applicable to this case.