UNITED STATES of America, Plaintiff,

v.

Spencer CHANG, Dominick Flyen and
Jose Fernandez, a/k/a Sefkat
Basuljavic, Defendants.

Crim. No. 93–119(PG).

United States District Court,
D. Puerto Rico.

Oct. 28, 1993.

Warren Vázquez, Asst. U.S. Atty., Hato Rey, PR, for plaintiff.

Thomas Lesser, Northampton, MA, Nancy Gertner, Boston, MA, José R. Aguayo, Hato Rey, PR, for defendants.

### OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

The defendants in this case, a trio of alleged credit card swindlers, move to suppress evidence of their activities seized from luggage in their hotel room.[1] A suppression hearing on the matter was held before the undersigned on July 12 and 13, 1993.[2] After combing through the pages of the suppression transcript and reviewing the parties' memoranda in support of or against suppression, the Court concludes that the Fourth Amendment rights of codefendants Spencer Chang and Dominick Flyen were trampled upon during the Government's search of the hotel room. Hence, the incriminating evidence obtained thereat must be suppressed as to these two individuals.

### The Relevant Facts [3]

On March 13, 1993, a housekeeper at the El San Juan Hotel, in Isla Verde, entered Room 320 therein to perform her duties. Whereupon, she discovered that the guests registered therein had abandoned the room. (Tr. 4, 5). She notified the front desk of this situation. That same day, Mr. Felipe Mercado Rosario, the night manager at the El San Juan Hotel, contacted the U.S. Secret Service ("USSS") to inform that two individuals who had checked into the hotel on March 11, 1993 had departed without checking out, leaving an outstanding balance of $4,504.00.[4]

---

1. The criminal complaint in this case states that the defendants "knowingly, willfully, and with the intent to defraud, aided and abetted each other to obtain $4,504.00 in services/merchandise from the El San Juan Hotel and American Express credit card # 3727 936424 62006, bearing the name G.B. Lew." This alleged conduct, if proven before a jury, constitutes a violation of 18 U.S.C. § 1029(a)(2) ("fraud and related activity in connection with access devices"), a felony.

2. At this hearing, the defendants initially moved to suppress (i) the fruits of the search of their hotel room and (ii) their photo identification by witnesses. This second ground however, was orally withdrawn by counsel for all three defendants at the closing of the suppression hearing. See Tr. 143 (Chang), 146 (Fernández and Flyen). Hence all motions regarding this second issue

have become moot at this juncture (docket # s 29, 32, 33 and 36).

3. These are taken from the testimony of United States Secret Service Agent Nelson Ulises Garabito, the Government's witness at the suppression hearing.

4. These individuals—the defendants in this case—had a whale of a time during their stay at the El San Juan Hotel, one of the most luxurious hotels on the Island. Along the charges they made to their hotel room was a $1,720.00 charge at the Amadeus Discotheque located at the hotel. There, in a two hour period, they consumed seven (7) bottles of Dom Perignon champagne. To add insult to injury, they left a $300.00 tip to the waitress who served them. (Tr. 8). See Government's Exhibits 2A and B (charge slips).

When an attempt was made to bill the American Express card provided during their check-in, the same was determined to be lost or stolen. (Tr. 4) The card which was in the name of "G.B. Lew," however, had been electronically processed and approved at the time of the defendants' check-in. Mercado Rosario also informed the Secret Service that the housekeeper had found in the room two additional credit cards with corresponding New Jersey drivers licenses and a group photograph of the two individuals and three other gentlemen.[5]

On the same date, Officer Jesús Ortiz–McCormick of the Puerto Rico Police Tourism Unit contacted Agent Don Barrett of the USSS and advised him that two of the other gentlemen in the group photograph—a Mr. Boga and Mr. Rakauskaus—had been located. Barrett as well as USSS Agent Garabito proceeded to interview them. None of these two individuals provided any identification. They only carried cash and one American Express credit card each. American Express Services was contacted and after a series of questions, they were confirmed to be the true card holders. During the interview, both individuals were shown the group photograph that had been left in Room 320. They alleged that they became acquainted with the other three individuals the previous night while gambling at the El San Juan Hotel's casino. Subsequently, they all went together to dinner at one of the hotel's restaurants, whereat the snapshot was taken. Both individuals denied having any knowledge of the whereabouts of the other three individuals as well as of any information regarding the stolen credit cards and New Jersey drivers licenses. Mr. Rivera–Esteban indicated that neither of these two individuals was among those who registered with the G.B. Lew card. Upon termination of the interview these two gentlemen were let go. (Tr. 6–7).

Police Officer Ortiz–McCormick and USSS Agents Barrett and Garabito then visited the casinos at the Sands, Condado Beach and Condado Plaza hotels in an unsuccessful effort to locate the defendants. They nonetheless briefed each hotel's security supervisor on the details of the case and left copies of the group photo. (Tr. 18).

The next sequence of events is best described by quoting Agent Garabito's testimony on direct examination:

> *Garabito:* On the 14th, I again received a phone call from police officer Jesús Ortiz–McCormick of the Puerto Rico Police. He advised me that three of the individuals depicted in the photograph had been located at the Condado Beach Hotel, in the casino area. Special Agent Don Barrett of the Secret Service, and Police Officer Ortiz–McCormick responded to the Condado Beach Casino. They went upstairs to the surveillance area where they were able to observe Messrs. Bazuljavic [Fernández], Chang and Flyen ...
>
> They observed the individuals at one of the casino tables playing as a group, they then responded down to the floor where they quietly effected the arrest of the individuals and took them away to the Manager's Office, for further interview ...
>
> Prior to my arrival the individuals were read their rights by Special Agent Don Barrett, and he initiated the interview process.
>
> Police Officer McCormick and Special Agent Barrett briefed me in all the incidents that had occurred prior to my arrival. Then I began the interview.
>
> Mr. Bazuljavic presented himself to me as José Fernández. He would not provide any other identification, He indicated he had no identification on his person.
>
> Mr. Spencer Chang initially indicated to me that his name was David Rector but approximately 10 minutes later withdrew

---

They also made a charge to their hotel room for $638.02 at W.H. Smith, a clothing store. (Tr. 34). *See* Government's Exhibit 9. A separate $374.98 charge to a stolen Visa credit card was also made at the Sunglass Hut of Isla Verde (Tr. 41). *See* Government's Exhibit 11B.

5. *See* Government's Exhibits 3 (photograph), 5A (Discover credit card), 5B and D (New Jersey Driver's Licenses) and 5C (Visa Credit Card). The two credit cards were determined to be lost or stolen. Both names in the driver's licenses, corresponding to those in the credit cards, were also determined to be fictitious names.

and indicated that his true name was Spencer Chang.

Mr. Dominick Flyen from the beginning indicated that his name is Dominick Flyen. As indicated earlier, the individuals would not provide any information. They indicated that they did not have any knowledge of credit card fraud, and they refused to cooperate whatsoever.

(Tr. 19–21). The following question-answer medley then ensued between Assistant United States Attorney Warren Vázquez ("AUSA") and Agent Garabito (emphasis by the Court where bolded or underlined):

*Garabito:* At this point I asked Mr. José Fernández Mr. Bazuljavic also known as José Fernández who was registered to room 741 at the Condado Beach Hotel if he consented to a search of his room.

*The Court:* Sorry, room?

*Garabito:* 741 at the Condado Beach Hotel.

*AUSA:* Who was the person who registered there?

*Garabito:* The name was José Fernández.

*AUSA:* Go ahead what happened next?

*Garabito:* Mr. Bazuljavic **consented**[6] to the search. Mr. Chang and Flyen seating next to him made no objections, we, that being myself, Special Agent Barrett, Police Officer McCormick, Mr. Jaime Vázquez, Surveillance Supervisor at the Condado Beach Hotel and another security officer by the name of Dario Nieves, all went upstairs to room 741.

*AUSA:* With whom?

*Garabito:* With Mr. Bazuljavic. **Mr. Bazuljavic opened the door to his room, and repeated what he had stated earlier downstairs also, and that was "you can search anything, I have nothing to hide."**

*AUSA:* How did Mr. Bazuljavic open room 741?

*Garabito:* With his key.

*AUSA:* Go ahead sir.

*Garabito:* We entered the room where we located **three** suitcases that were in a semi-packed condition, **the suitcases were empty, were open, however they were— some things were packed or beginning to be packed in the suitcases.** We—.

*AUSA:* Excuse me sir, how were these suitcases, these three suitcases specifically how were they in the room?

*Garabito:* One was on the floor one was on the bed, one was on a couch.

*AUSA:* Were they closed or were they open?

*Garabito:* **They were open.**

*AUSA:* Okay, go ahead and keep going in detail, Sir.

*Garabito:* We started looking through the various suitcases myself and Police Officer McCormick, started looking through the various suitcases and we started to pull out of the various suitcases any items that appeared to be new or had the sales tags or the tags that you would have in stores still on them, and we proceeded to place those items on top of the bed.[7]

We were able to find a number of items which are listed on the [Government's] inventory sheets. In addition to that Police Officer McCormick located within a pocket within a garment bag, a black garment bag, located four American Airlines round trip tickets from San Juan to New York totalling some $3,000.00. plus dollars hidden in one of the pockets inside the black garment bag.[8]

I asked Mr. Bazuljavic whose bag that was, and he indicated that the bag belonged to Mr. Spencer Chang.

*AUSA:* Okay, what else happened?

*Garabito:* We continued putting all these items together I then contacted AUSA Fratallone and then Magistrate Arenas.

---

6. This fact was not contested by the defendants.

7. Amongst these items for example were two pairs of sunglasses (Ray Ban and Persol Brown brands) and an Alexander Julien shirt bearing a W.H. Smith price tag. *See* Government's Exhibit 4A (inventory sheet).

8. One of these tickets was issued in the name of Mark O'Brien, the name in the Discover Card found at the El San Juan Hotel room which had been reported lost/stolen. (Tr. 48).

Informed them of the situation and they authorized the arrest of the individuals.

(Tr. 21–23).

\* \* \* \* \* \*

On cross-examination Agent Garabito testified as follows upon being questioned by Attorney Lesser (for Defendant Chang):

*Lesser:* Agent Garabito, when we left off, we were discussing March 14th at the Condado Beach Hotel Casino, and you had arrived at that point Mr. Chang, in fact at that point all three defendants in this case were then under arrest?

*Garabito:* That's correct.

*Lesser:* And to the best of your knowledge they had been given Miranda warnings is that correct?

*Garabito:* That is correct.

(Tr. 61).

*Lesser:* When you got up there to room 741 after who ever opened the door opened the door, when you walked in, there were **three** suitcases visible, correct?

*Garabito:* That's correct.

*Lesser:* And my recollection of your testimony is that there were **three** suitcases visible?

*Garabito:* To the best of my knowledge, yes.

*Lesser:* And one was on a couch?

*Garabito:* That is correct, not a suitcase that was the black garment bag.

*Lesser:* That was the black garment bag that you later determined that was owned by Mr. Chang?

*Garabito:* What Mr. Bazuljavic stated belonged to Mr. Chang.

*Lesser:* Mr. Bazuljavic stated that the garment bag belonged to Mr. Chang, correct?

*Garabito:* That's correct.

*Lesser:* And there was also a bag on a bed I believe you testified.

*Garabito:* Again to the best of my recollection there was a suitcase on the bed.

*Lesser:* And whose suitcase was that if you know?

*Garabito:* I don't know.

*Lesser:* And then there was a third suitcase and that was on the floor by the bathroom?

*Garabito:* That's correct.

*Lesser:* Getting back to the black garment bag, was that a garment bag, do you recall what it was made of?

*Garabito:* I believe it was nylon material.

*Lesser* Was it a standard garment bag with pockets on all sides?

*Garabito:* I don't know if all sides. It was in the open position, in other words it was unfolded. I think it had some pockets on the other side.

*Lesser:* You could see pockets?

*Garabito:* I did see pockets on the outside.

*Lesser:* And there would have been the pockets on the side, you couldn't see the bottom side, correct?

*Garabito:* Inside, is that what you are referring to?

*Lesser:* Well it was lying flat the garment bag?

*Garabito:* Correct.

*Lesser:* And you are saying there pockets [sic] on the top you could see?

*Garabito:* That's the underside of the bag, in other words, a garment bag holds like this, when its in the open position this is the top.

*Lesser:* On the front of the back there were also pockets?

*Garabito:* Yes, zippered pockets.

*Lesser:* So there were pockets on both sides of the bag that is fair to say?

*Garabito:* Yes, and also inside the bag.

*Lesser:* Once you open it up?

*Garabito:* Yes.

*Lesser:* But at that point you had not opened it up correct?

*Garabito:* **The zipper was approximately three quarters of the way down in the flap part.**

*Lesser:* You could see some contents and **some contents were in the pockets?**

*Garabito:* **Yes.**

*Lesser:* On the other side you could not see?

*Garabito:* Yes.

(Tr. 76–79).

*Lesser:* So Police Officer McCormick you testified was the first to say look here, look the black garment bag?

*Garabito:* I also went on the black garment bag and removed some items that are placed in the center of the room.

*Lesser:* Did you remove those items after he had looked through it?

*Garabito:* No, I believe I look to that first I believe I look to that one before Agent McCormick, because I recall *in the airline tickets that were found, he found that in an inner pocket that I had not detected.*

*Lesser:* So you looked through it, found certain items when you looked through it?

*Garabito:* Yes.

*Lesser:* Then he found other items when he looked through it?

*Garabito:* Specifically the air line tickets, yes.

(Tr. 80).

*Lesser:* **When Sir it is fair to say that when you walked into the room you knew that Mr. Chang had been in that room and you knew Mr. Fernández had been in that room?**

*Garabito:* **That's our belief, yes.**

*Lesser:* That was your understanding?

*Garabito:* Correct.

*Lesser:* That was the best of your knowledge at that moment in time?

*Garabito:* That is correct.

*Lesser:* There had been at least two people, if not three people.

*Garabito:* **We believed all three.**

*Lesser:* **You believed that all three had been staying there.**

*Garabito:* **Yes, sir.**

*Lesser:* So you believed all three had been staying there, and you saw the three suitcases?

*Garabito:* Yes, Sir.

*Lesser:* And it would have been fair to say that your understanding would have been and would have been normal to think that each of the three people, owned one of the suitcases?

*AUSA:* Objection, speculative.

*The Court:* Sustained.

*Lesser:* In any case, you searched all three suitcases?

*Garabito:* Yes.

*Lesser:* **And you did not go downstairs and asked Mr. Chang for permission to search the suitcase?**

*Garabito:* **No, the garment bag had already been searched.**

*Lesser:* **Upon seeing three suitcases, you did not go back downstairs and ask either of the two people who were arrested for permission to search?**

*Garabito:* **No, Sir. Before we went up I asked Mr. Fernández, he consented and I did not know the other two individuals had any objections.**

(Tr. 86–87).

\*     \*     \*     \*     \*     \*

Attorney Nogueras, Assistant Federal Public Defender (for codefendant Flyen), further asked the following relevant questions:

*Nogueras:* All right, and Mr. Flyen exercised his right to remain silent, correct?

*Garabito:* Yes when I attempted to interview him yes, Sir.

*Nogueras:* **Okay, during the investigation you identified room 741 would it be fair to say that you assumed that Mr. Flyen was staying in that room?**

*Garabito:* **Yes, Sir that is correct.**

(Tr. 129). Furthermore,

*Nogueras:* **I understand, and its fair to say that you never went downstairs to Mr Flyen to ask him whether one of those suitcases belonged to him?**

*Garabito:* **No Sir.**

*Nogueras:* **Nor did you ask permission to search any suitcase if it belonged to him?**

*Garabito:* **State that again, please.**

*Nogueras:* **You did not ask permission from Mr. Flyen to check any suitcase upstairs?**

*Garabito:* **I didn't ask permission from Mr. Flyen.**

*Nogueras:* And you certainly never got a search warrant?

*Garabito:* No Sir.

(Tr. 130–31).

### Legal Analysis

■■■ There is no better place to commence than at the beginning, so let us do just that. The first issue that arises in this case is *whether the defendants' arrest was lawful.* The Court concludes that it was indeed so. It is hornbook law that, the existence of probable cause is necessary for an officer of the law to conduct a warrantless arrest. *See Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963). For probable cause to arrest a person to exist, two conclusions must be justified by substantial and reliable evidence: (i) that a violation of the law must have been committed, and (ii) that the person to be arrested committed the violation. The above stated rule stands constitutional muster even where a defendant is found in a public place and the arresting officer may reasonably procure an arrest warrant. *See United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1975).

In the case at bar, probable cause to arrest the defendants at the Condado Beach Hotel casino (for violating 18 U.S.C. § 1029(a)(2)) existed based on (i) the fact that the defendants did not pay their hotel room at the El San Juan Hotel; (ii) the fact that the American Express card to which the hotel charges were made was reported as lost or stolen; and (iii) their identification via the group photograph.[9]

\* \* \* \* \* \*

■■■ The second issue we must address is *whether consent was given to enter the defendants' room at the Condado Beach Ho-*

*tel.* A defendant's consent, if validly obtained, overcomes the Fourth Amendment's presumptive prohibition against warrantless searches. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Cruz–Jimenez,* 894 F.2d 1, 7 (1st Cir.1990). A warrantless entry into commonly occupied premises and subsequent search thereof is valid where *at the time of the entry* the police reasonably believed that the consenting party possessed "common authority" over the premises. *See Illinois v. Rodriguez,* 497 U.S. 177, 185, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990).

In the case at bar, Agent Garabito testified that he believed that all three individuals were staying in the same room at the Condado Beach Hotel. (Tr. 86–87). This is not unreasonable in view of the overall circumstances of this case. The three defendants had been previously observed together at the El San Juan Hotel. The photograph discovered by the housekeeper indeed evinces this. The investigation up to the time of the defendants' arrest also revealed that they had attempted to leave the Island but were unable to due to a terrible storm in the Northeast. Instead, they were now staying in the Condado area. (Tr. 18). Subsequently before their arrest, the defendants were observed together at the Condado Beach Hotel's casino. Thus, upon codefendant Fernández's acquiescence—that of a party possessing "common authority" over the hotel room—, the agents reasonably acted within the Fourth Amendment's parameters by entering the hotel room.

\* \* \* \* \* \*

■■■ Although codefendant Fernández gave the agents his consent to search "anything" in the room[10], his consent did not automatically confer upon the agents authority to search without a warrant any *luggage*

---

**9.** In his memorandum of law codefendant Chang states that no probable cause to arrest him existed. He contends that the only information known to the Secret Service concerning him prior to his arrest was that he had been seen in the company of codefendants Fernández and Flyen. Thus, he should have been released by the agents just as the two other individuals in the group photograph, Mr. Boga and Rakauskaus.

The Court disagrees with the above argument. In Chang's case, there is additional evidence

linking him with Flyen and Fernández. He was seen trying to leave the Island with Fernández and Flyen. (Tr. 18). Later, at the Condado Beach Hotel, Chang was present at the check-in and further signed a registration card in the name of David Rector. (Tr. 10, 47).

**10.** Fernández hence has no standing to contest any fruits of the search.

belonging to codefendants *Chang* and *Flyen*. These two codefendants had a reasonable expectation of privacy as to the contents thereof. In the case at bar, Agent Garabito testified that it was his belief that the three defendants were staying in the same hotel room. (Tr. 86–87). Logically, when spotting the three pieces of luggage in the room he must have concluded that in all likelihood *a piece of luggage belonged to each defendant.* He nonetheless proceeded to search their contents without asking Mr. Chang or Mr. Flyen for their consent. (Tr. 87). This conduct on its face indeed constitutes a Fourth Amendment violation. The Court must therefore determine whether any of the exceptions to the exclusionary rule apply so as to not have to suppress the evidence found in these two defendant's suitcases. Two important exceptions seemingly apply at first glance: the "plain view" exception and the "inventory search" exception.[11] Nonetheless, after careful consideration of the particular facts of this case and the applicable jurisprudence, the Court concludes that these exceptions do not apply to this case.

### (i) The plain view doctrine

Government agents may lawfully seize evidence in plain view without a warrant in those circumstances where the initial intrusion that brings the agents within plain view is supported by one of the recognized exceptions to the warrant requirement. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987). Furthermore, the incriminating nature of the items seized must be *immediately apparent; that is, it must be supported by probable cause. Id.* at 326.

---

11. The Government in its response does not argue the existence of any exceptions to the exclusionary rule other than the consent of codefendant Fernández to search the hotel room. Codefendant Chang however, has raised the issue of nonapplicability of the plain view exception to his case. *See* Codefendant Chang's Memorandum of Law at p. 21. The Court thus, deems it appropriate to discuss these two other exceptions.

12. Codefendant Chang's bag was partially open. (Tr. 79).

13. The fact that the evidentiary items in the defendants' luggage were commingled poses an

In the case at bar, it is evident that the first *Hicks* prong is met as the agents were lawfully inside the hotel room following codefendant Fernández's consent to search the same. (Tr. 22). However, the second *Hicks* prong is not met. In this instance, although the suitcases/bags were open[12] and some of their contents were visible (Tr. 22), the incriminating nature of their contents was not apparent as the agents had to browse through the contents of the suitcases to collect incriminating evidence. Agent Garabito himself testified so at the suppression hearing:

> We started looking through the various suitcases myself and Police Officer McCormick, started *looking through the various suitcases* [sic] and we started to pull out of the various suitcases *any items that appeared to be new or had the sales tags or the tags that you would have in stores still on them, and we proceeded to place those items on top of the bed.*[13]
>
> *We were able to find a number of items which are listed on the inventory sheets.* (Tr. 22) (Emphasis added).

Furthermore, codefendant Chang's black garment bag had *zippered* pockets on both sides and also on the inside. (Tr. 78). Clearly, thus, any items inside these pockets were not in plain view.[14] Hence, the plain view exception is inapplicable in the case at bar.

### (ii) Inventory search

The Supreme Court has never decided the issue of whether an inventory search of luggage belonging to an arrestee is constitutionally permissible where the arrestee is

---

other problem. Normally, each defendant only has standing to contest the fruits of the search of his *own* luggage. However, here it is impossible to ascertain precisely what came out of what bag. Thus for suppression purposes, all the evidence would have to be suppressed as to any defendant whose Fourth Amendment rights were violated.

14. Four American Airlines tickets from San Juan to New York totalling over $3,000.00 were the only items Agent Garabito was certain came from inside these pockets. (Tr. 23, 80).

registered as a guest in a hotel and the luggage is inside his or her room. The Court of Appeals for the First Circuit also has not squarely faced this issue.[15] Those courts, both federal and state, which have tackled this precise issue have taken three different approaches:

> One is that the motel or hotel arrest is to be treated exactly like the at-home arrest, so that officers have "no greater right to remove or search defendant's personal belongings that were not on his person or within his immediate control than they would have if they had made the arrest in his house." At the other extreme, it has been held that the removal of the defendant's effects from his motel room is proper, at least where the defendant does not "offer any objection or suggest any other arrangement for the safekeeping of [his] possessions," because the hotel or motel management cannot be expected "to permit those belongings to remain indefinitely in the vacated room." The middle ground is that since the law does not "place any responsibility on the [police] for the care of defendant's property located in the motel room" and adequately protects the innkeeper "by statutory provisions limiting the liability of an innkeeper for loss of guests' property," it is only the defendant's interests which are at stake, meaning the police are obligated to give him "the choice of leaving his belongings in the motel room or requesting the [police] to take them into custody for him."

2 W.R. LaFave, *Search and Seizure* § 5.5(b) at 538–9 (1987 & Supp.1993) (collecting federal and state jurisprudence) (footnotes omitted).

**15.** In *United States v. Osorio de Santiago*, 626 F.Supp. 329 (D.P.R.1986), *aff'd*, 828 F.2d 866 (1st Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988), the post-arrest inventory search of items seized in a hotel room was held valid pursuant to *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Nonetheless, both the District and Circuit courts specifically conceded that the defendants *did not* contest the legality of the seizure of the evidence from the hotel room. 626 F.Supp. at 334; 828 F.2d at 869. In the instant case, contrariwise, the defendants have challenged the seizure of their luggage and its contents.

Before discussing the three above approaches, two important facts must once again be alluded to. First, the agents quite reasonably suspected that the *three* defendants were staying at Room 741 of the Condado Beach Hotel. (Tr. 86). Second, two of the defendants were *registered as guests in the Condado Beach Hotel*.[16] (Tr. 47). This means that at least until checkout time the next day their luggage would remain safe in the room—sufficient time in which to procure a search warrant.[17]

Based on the above evidence, none of the three tests discussed by Professor LaFave in his treatise are met in the case at bar. The first approach—treating the hotel room like a dwelling—dictates that a warrant be issued in order to seize the defendants' belongings. This clearly was not done here. The second approach was also not taken. The agents never asked the defendants whether they objected to a search of their belongings or preferred another safekeeping arrangement. To the contrary, as Agent Garabito himself testified regarding the search of the luggage: "I did not know [Chang and Flyen] had any objections." (Tr. 87). Finally, the third approach fails since the defendants were not given a choice to leave their belongings in the hotel room or to let the agents take them into custody. Hence, the inventory search exception is inapplicable in the case at bar. *Cf. Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (inventory search of articles in defendant's possession lawful where he or she is to be incarcerated); *United States v. Ramos–Morales*, 981 F.2d 625, 627 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2384, 124 L.Ed.2d 287 (1993) (inventory search of impounded automobile lawful).

**16.** Both Chang and Fernández signed the hotel's registration form. *See* Footnote 9, *supra*.

**17.** The defendants checked in at the Condado Beach on March 14, 1993—the same day they were arrested. In their check-in form they stated they would leave the next day, the 15th. The check-in form itself states that "Our Check Out Time is 12:00 Noon." *See* Government's Exhibit 14B.

## Conclusion

Probable cause existed to arrest the three defendants at the Condado Beach Hotel. Subsequently, codefendant Fernández's consent to search "anything" in the room permitted the government agents to lawfully enter the defendants' hotel room. However, in view of the fact that the Government agents were reasonably aware of the fact that only one piece of luggage belonged to Fernández, they did not have the authority to search the luggage belonging to codefendants Chang and Flyen. These two individuals did not consent to a search of their belongings. The search thereof thus violated their Fourth Amendment rights. Since none of the exceptions to the warrant requirement are present in this instance, the Court must suppress the evidence found in their luggage. Since all the fruits of the search were commingled, there is no certain way to ascertain what precisely was in whose bag. Thus all the evidence found in Room 741 of the Condado Beach Hotel must be **SUPPRESSED** as to defendants Flyen and Chang. Nonetheless, since the arrest of all the defendants was lawful, any other evidence obtained thereafter is admissible at trial.

WHEREFORE, in view of the above, codefendant Fernández's Motion to Suppress (docket # 31) is hereby **DENIED**. Codefendant Flyen's Motion to Suppress (docket # 33) and codefendant Chang's Motion to Suppress (docket # s 27, 59) are hereby **GRANTED as to all the evidence found in Room 741 of the Condado Beach Hotel.** The following other motions have become **MOOT** at this juncture: docket # s 25, 29, 31, 32, 33, 36 and 39.

**IT IS SO ORDERED.**